**United States Court of Appeals**
**Fifth Circuit**

**F I L E D**

**March 22, 2007**

**Charles R. Fulbruge III**
**Clerk**

IN THE UNITED STATES COURT OF APPEALS

FOR THE FIFTH CIRCUIT
_____

No. 06-20292
_____

STAFF IT, INC., A TEXAS CORPORATION

Plaintiff-Appellant

v.

UNITED STATES OF AMERICA,

Defendant-Appellee

-----------------------
Appeal from the
United States District Court
for the Southern District of Texas
-----------------------

Before GARWOOD, WIENER, and CLEMENT, Circuit Judges.

WIENER, Circuit Judge:

Plaintiff-Appellant Staff IT, Inc. ("S.I.") failed to file, pay, and deposit payroll taxes during the course of three tax quarters. The Internal Revenue Service ("IRS") initiated collection proceedings against S.I., seeking the unpaid taxes, interest on them, and penalties for S.I.'s failure timely to file, pay, and deposit such taxes. After the IRS Office of Appeals administratively sustained a proposed levy, S.I. filed a complaint in the district court, contending that, because of financial hardship, it should be excused from paying the penalties. The district court ruled against S.I., which then appealed to us.

On appeal, the government relies on <u>Brewery, Inc. v. United States</u>[1] in arguing that financial hardship can never be a justification for the abatement of employment tax penalties. In diametric opposition, S.I. relies on caselaw from the Second,[2] Third,[3] Seventh,[4] and Ninth Circuits[5] in arguing that financial hardship may justify the abatement of employment tax penalties, insisting that it does so under the facts and circumstances present here.

Like the district court, we need not decide today whether financial hardship may ever justify the abatement of employment tax penalties. Instead, we hold that S.I. is not entitled to an abatement of penalties even when we assume <u>arguendo</u> that, under some circumstances, penalties for failure to file, pay, and deposit payroll taxes could be abated for financial hardship.

## I. <u>FACTS AND PROCEEDINGS</u>

---

[1] 33 F.3d 589 (6th Cir. 1994).

[2] <u>Fran Corp. v. United States</u>, 164 F.3d 814 (2d Cir. 1999).

[3] <u>E. Wind Indus., Inc. v. United States</u>, 196 F.3d 499 (3d Cir. 1999).

[4] <u>Diamond Plating Co. v. United States</u>, 390 F.3d 1035 (7th Cir. 2004).

[5] <u>Van Camp & Bennion v. United States</u>, 251 F.3d 862 (9th Cir. 2001).

2

S.I. is an accrual-basis taxpayer operating out of Houston, Texas. It was incorporated in 1996 as a personnel staffing company specializing in providing computer programmers and other technical personnel ("contractors") to outside businesses ("clients"). Typically, clients would engage S.I. to fill vacancies in their computer programmer or other technical positions.

Contractors hired by S.I. would be placed on S.I.'s payroll, but would work under the designated client's direction. Each pay period, S.I. would pay the contractors their net compensation after withholding such items as income and social security taxes. S.I. would invoice the client for the contractors' services, including a surcharge for S.I. Clients would usually pay S.I. within thirty to ninety days after being invoiced.

Based on its invoicing practice, S.I. had to carry its costs between the time it paid its contractors and the time it received payment from its clients. This practice required substantial working capital to cover the resulting time gap. Some of this required capital came from S.I.'s officer-stockholders who invested in or made loans to S.I., but S.I. still had to borrow a significant portion of its working capital from financial institutions.

As a relatively small business with no "hard" assets, such

as land, buildings, equipment, or manufacturing facilities, S.I. was not able to borrow capital from traditional banks. Other than a few computers, desks, and chairs, S.I.'s only assets were its accounts receivable, which mainline banks ordinarily deem to be insufficient collateral. Thus, S.I.'s only source of working capital was financing companies ("factors" or "factoring companies").

In the factoring process, a business sells its accounts receivables to a finance company at a discount. Then, as the business collects its receivables, it repays the factor. (In some cases, clients pay the factor directly.)

In 2001, S.I. obtained financing through Prinvest Capital Corp. ("Prinvest"), a factoring company. Under the factoring agreement, Prinvest would advance S.I. approximately seventy to eighty percent of the revenue expected from a S.I. client, and S.I. would instruct the client to pay Prinvest directly. Then, when Prinvest received payment from the client, Prinvest would deduct its charges and forward the remainder to S.I. By mid-2001, S.I.'s annual billings had grown to approximately $16,000,000.00, and Prinvest was financing approximately one-third of S.I.'s receivables.

S.I. employed more than two hundred contractors, had accrued monthly revenues of almost $1,600,000.00, and had a monthly cash

4

flow of over $2,000,000.00.  S.I.'s payroll taxes were almost $3,000,000.00 in 2000 and almost $2,000,000.00 from January to September 2001.  Until the last tax quarter of 2001, S.I. timely filed, paid, and deposited its payroll taxes.

Beginning in May 2001, S.I. began to experience a series of financial set backs.  During the months of May, June, and July 2001, S.I.'s largest client, Compaq Computer, laid off a significant portion of its workforce, including 55 of its 106 S.I. contractors.  As a result, S.I. lost $400,000.00 in revenue.  During the same period, Enron and Dynegy, smaller S.I. clients, laid off 12 S.I. contractors.

In June 2001, as a response to the Compaq lay-offs, Prinvest refused to finance any more of S.I.'s receivables, eventually declaring bankruptcy in August of that year.  This left S.I. with no financing source.  S.I. began negotiations with another potential lender to replace Prinvest and obtained an informal financing agreement in September.  This eventually fell through, however, during the period of financial uncertainty that followed the September 11, 2001 terrorist attacks.

In October 2001, Prinvest demanded a substantial loan repayment from S.I., threatening to contact S.I.'s clients directly and call in all S.I.'s receivables if the repayment were not made.  Rick McMinn, a S.I. officer and 40% stockholder,

5

together with S.I.'s other two officer-stockholders, personally guaranteed Prinvest's loan to S.I. McMinn used his home as collateral in borrowing $300,000.00, which he then loaned to S.I. on the same terms that the bank had loaned that money to him. S.I. used those funds to pay the $300,000.00 to Prinvest.

S.I. cut some minor expenses during this period. Some of these expenses were not eliminated, however, but were merely deferred until the following month.

S.I. continued to place contractors at Enron and Compaq in October 2001, despite announcements that these two clients would indefinitely suspend invoice payments. S.I. cut other "G & A" costs — a catch-all category of expenses — including some advertising and recruiting expenses, but did not issue a broad directive to cut expenses. S.I. paid $100,000.00 to creditors other than Prinvest in October while increasing its marketing efforts by shifting two staff employees from the recruiting of contractors to the selling of S.I.'s services (i.e., marketing). The marketing efforts were part of S.I.'s plan to overcome its financial difficulties by "growing" the business and catching-up.

Enron continued to weaken in November and December of 2001, eventually filing for bankruptcy protection. S.I. lost approximately $450,000.00 in receivables as a result, but did not file a claim in the bankruptcy proceeding because of the

6

attendant expenses and fees and the likelihood of an unfavorable result.

S.I. failed to make payroll tax deposits in November and December 2001. During these months, S.I. delayed payments to some third-party creditors and on some debts, but did not reduce (1) the number of contractors on its payroll, (2) the number of its employees, or (3) salaries (not even the salaries of its three officer-stockholders at $240,000 per annum each). Neither did S.I. issue a broad directive to reduce expenses. At that time, S.I. was anticipating a growth in business from its increased marketing efforts, which S.I. hoped would enable it to pay its past-due fourth quarter 2001 payroll taxes, as well as to make timely deposits of its 2002 payroll taxes.

S.I. continued to spend on marketing, advertising, and operating expenses. It also continued to provide monthly vehicle allowances for those of its employees who had to drive to clients' places of business, and to take clients to Houston Astros games, including paying for season parking. During the time in question, S.I. spent $3,500.00 on a Christmas party, expended additional funds for promotional items, such as drink koozies and rulers, and paid $800.00 for Christmas hams for its contractors. S.I. also continued to entertain clients by treating them to meals. S.I. justified these expenses as part of

7

its advertising and client-relations efforts.

By early 2002, S.I.'s anticipated business increase had failed to materialize and its existing business declined. S.I. had still not obtained a new factor to replace Prinvest, and Global Crossing, another S.I. client, filed for bankruptcy. S.I. did attempt to cut some costs, but negative cash flow outpaced these savings.

In February 2002, S.I. scaled back some of its debt payments, reduced rent payments, and cut payments to third-party creditors; yet it continued to pay its employees and contractors, and its operating expenses in full. S.I. made no layoffs and did not reduce salaries. In the absence of a factor, McMinn loaned S.I. another $50,000.00. S.I. did not make any payroll tax deposits in January or February of 2002, continuing to believe that the downturn was temporary and to hope that once it secured a new factor, it would be able to pay the IRS.

Early in 2002, S.I. finally secured a new factor. Now accepting the need to reduce expenses, S.I. laid off some employees and contractors and otherwise cut salaries and costs. S.I. reduced the salaries of its three officer-stockholders by 57% from 2001 levels — down from $240,000.00 to $104,000.00. S.I. reduced other employees' salaries by 22% from 2001 levels and cut the monthly vehicle allowances and client meals that it

had funded. S.I. also reduced advertising by 18% from 2001 levels.

S.I.'s newly secured factor would not advance funds without first obtaining a lien on S.I.'s receivables. As Prinvest still maintained a lien on S.I.'s receivables, S.I. paid Prinvest more than $200,000.00 to release its lien on S.I.'s receivables. Although S.I. continued to pay its operating expenses, it made no payroll tax deposits in March, April, or May of 2002. It did not start to make significant payroll tax deposits until June.

Even then, S.I. did not pay its back payroll taxes to the IRS. During the last six months of 2002, however, S.I. paid most of its payroll taxes as they accrued, with the exception of December. In that month, S.I.'s new factor retained invoiced payments, causing S.I. to fall short on its deposit of payroll taxes. S.I. met its wage, interest, and operating cost obligations, but by the end of the year, it owed its attorneys and others more than $200,000.00.

In mid-October 2003, the IRS sent S.I. a notice of intent to levy on the company's assets to collect payroll taxes, interest, and penalties for the three tax quarters ending December 31, 2001, March 31, 2002, and September 30, 2002. The penalties at issue were: (1) late-filing penalties for the fourth quarter of 2001 and the first quarter of 2002, pursuant to 26 U.S.C. §

9

6651(a)(1); (2) late-payment penalties for the fourth quarter of 2001 and the first quarter of 2002, pursuant to 26 U.S.C. § 6651(a)(2); and (3) late-deposit penalties for all three quarters at issue, pursuant to 26 U.S.C. § 6656.

On November 7, 2003, the IRS sent S.I. a Notice of Federal Tax Lien Filing in connection with the company's unpaid payroll taxes (excluding penalties and interest) for the same quarters. In these notices, the IRS advised S.I. of its right to seek a Collection Due-Process ("CDP") hearing under 26 U.S.C. §§ 6320 and 6330.

S.I. requested a CDP hearing with respect to both the proposed levy and the notice of tax lien, challenging the penalties against it but not the underlying tax liabilities or interest. It requested abatement of the penalties for the quarters ending December 31, 2001 and March 31, 2002 on the ground that the company had reasonable cause for late filings, late deposits, and late payments. S.I. requested abatement of the penalties for the quarter ending September 30, 2002 on the ground that the company had timely filed returns and deposited and paid the taxes when due for that quarter.

S.I. met with an IRS Appeals Officer on February 17, 2004, regarding its request for abatement of penalties. The Appeals Officer issued a notice of determination denying S.I.'s requests

10

for penalty abatement and an installment plan, but gave S.I. until May 10, 2004 to satisfy its current compliance requirements. The Appeals Officer concluded that S.I. had not shown reasonable cause for failing to file timely returns or to make timely deposits and payments. He observed that, even though S.I. obviously faced financial difficulties during the period at issue, the company had continued to furnish contractors to clients despite learning that the clients would not be making timely payments. The Appeals Officer also noted that S.I. had continued to pay its corporate officers, who were not essential creditors.

In June 2004, S.I. filed suit in the district court, seeking review of the notice of determination. There, S.I. asserted that its financial hardship in 2001 and 2002 constituted reasonable cause for its failure timely to file, to pay, and to deposit payroll taxes. In December, the government filed a motion for summary judgment, asserting, inter alia, that financial hardship can never constitute reasonable cause for the abatement of payroll tax penalties.

In its written ruling, the district court acknowledged the existence of a split in authority on the standards governing financial difficulty/reasonable cause cases. The court observed that (1) the Sixth Circuit had held that financial difficulties

11

can never constitute reasonable cause to excuse penalties for a taxpayer's failure to satisfy its payroll tax obligations; but (2) several other courts of appeals had rejected the Sixth Circuit's bright-line rule and had held that all facts and circumstances of the taxpayer's financial situations must be assessed to determine whether the taxpayer has demonstrated reasonable cause that would entitle it to an abatement.

Rather than decide which standard to apply, the district court concluded that under either standard, the government was entitled to summary judgment because S.I. had not shown that its failure to satisfy its payroll tax obligations resulted from reasonable cause.  S.I. timely filed a notice of appeal.

## II.  LAW AND ANALYSIS

### A.  Standard of Review

We review grants of summary judgment <u>de novo</u>, applying the same standard as the district court.[6]  Summary judgment is appropriate when there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law.[7]  In collection due process cases in which the underlying tax liabilities are at issue, we review the underlying tax liability

---

[6] <u>Abarca v. Metro. Transit Auth.</u>, 404 F.3d 938, 940 (5th Cir. 2005).

[7] <u>Dallas Fire Fighters Ass'n v. City of Dallas</u>, 150 F.3d 438, 440 (5th Cir. 1998).

12

de novo and other administrative decisions for an abuse of discretion.[8] Determination of the presence of the elements required to prove reasonable cause for failure to satisfy payroll tax obligations is a question of law, but determination whether those elements are present in a given situation is a question of fact.[9]

## B. **Merits**

The Internal Revenue Code ("IRC") requires employers to deduct and withhold income and social security taxes from its employees' salaries and wages.[10] These taxes must be held by the employer in a special trust fund for the benefit of the government.[11] An employer is liable for the payment of the taxes required to be withheld and is required to report the amounts of withheld taxes on its payroll tax returns.[12] These returns and payments of payroll taxes are due each calendar quarter.[13] An employer is required to deposit the employment and income taxes withheld in an approved bank at various intervals during a

---

[8] Jones v. Commissioner, 338 F.3d 463, 466 (5th Cir. 2003).

[9] United States v. Boyle, 469 U.S. 241, 249 n.8 (1985).

[10] 26 U.S.C. §§ 3102(a), 3402(a).

[11] Id. § 7501.

[12] Id. § 3403.

[13] Id. § 6011(a).

13

calendar quarter, depending on how much is withheld.[14]

The IRS imposes mandatory penalties for failure to (1) file payroll tax returns, (2) pay payroll taxes, and (3) deposit payroll taxes in a government-authorized depository, unless the taxpayer can demonstrate that such failure was occasioned by "reasonable cause and not due to willful neglect."[15]  Thus, to obtain abatement of employment tax penalties imposed under §§ 6651 and 6656, the taxpayer must bear the heavy burden of proving that (1) the failure did not result from "willful neglect;" and (2) the failure was occasioned by "reasonable cause."[16]  Neither "willful neglect" nor "reasonable cause" are defined in the IRC.

In United States v. Boyle, the Supreme Court defined "willful neglect," as used in § 6651(a)(1), as "a conscious, intentional failure or reckless indifference."[17]  Stated differently, the taxpayer must show that the failure to file a return was the result "neither of carelessness, reckless

---

[14] Id. § 6302; 26 C.F.R. § 301.6302-1.

[15] 26 U.S.C. §§ 6651(a)(1), (a)(2), 6656(a).

[16] Boyle, 469 U.S. at 245.

[17] Id.  The analysis in Boyle only concerned failure-to-file penalties under § 6651(a)(1) and not failure-to-pay or failure-to-deposit penalties under §§ 6651(a)(2) and 6656, respectively.  The language concerning the relevant standard is identical in all three provisions.  Thus, we find no reason to treat the language in § 6651(a)(1) differently from that in §§ 6651(a)(2) and 6656.  E. Wind, 196 F.3d at 504 n.5.

14

indifference, nor intentional failure."[18]

There is no jurisprudential definition of "reasonable cause;" however, the Treasury Regulations shed some light on its meaning.

1. **Failure to File**

For failure-to-file situations under § 6651(a), the Treasury Regulations explain:

> If the taxpayer exercised ordinary business care and prudence and was nevertheless unable to file the return within the prescribed time, then the delay is due to reasonable cause.[19]

2. **Failure to Pay**

For failure-to-pay situations under § 6651(a)(2), the Treasury Regulations explain:

> A failure to pay will be considered to be due to reasonable cause to the extent that the taxpayer has made a satisfactory showing that he exercised ordinary business care and prudence in providing for payment of his tax liability and was nevertheless either unable to pay the tax or would suffer an undue hardship (as described in § 1.6161-1(b) of this chapter) if he paid on the due date. In determining whether the taxpayer was unable to pay the tax in spite of the exercise of ordinary business care and prudence in providing for payment of his tax liability, consideration will be given to all the facts and circumstances of the taxpayer's financial situation, including the amount and nature of the taxpayer's expenditures in light of the income (or other amounts) he could, at the time of such expenditures, reasonably expect to receive prior

---

[18] Boyle, 469 U.S. at 246 n.4.

[19] 26 C.F.R. § 301.6651-1(c)(1).

15

to the date prescribed for the payment of the tax. Thus, for example, a taxpayer who incurs lavish or extravagant living expenses in an amount such that the remainder of his assets and anticipated income will be insufficient to pay his tax, has not exercised ordinary business care and prudence in providing for the payment of his tax liability. Further, a taxpayer who invests funds in speculative or illiquid assets has not exercised ordinary business care and prudence in providing for the payment of his tax liability unless, at the time of the investment, the remainder of the taxpayer's assets and estimated income will be sufficient to pay his tax or it can be reasonably foreseen that the speculative or illiquid investment made by the taxpayer can be utilized (by sale or as security for a loan) to realize sufficient funds to satisfy the tax liability. A taxpayer will be considered to have exercised ordinary business care and prudence if he made reasonable efforts to conserve sufficient assets in marketable form to satisfy his tax liability and nevertheless was unable to pay all or a portion of the tax when it became due.[20]

In addition to the nature of the taxpayer's actions, the nature of the tax at issue must be considered.[21] The Treasury Regulations expressly state that "[i]n determining if the taxpayer exercised ordinary reasonable care and prudence in providing for the payment of his tax liability, consideration will be given to the nature of the tax which the taxpayer has failed to pay."[22]

---

[20] Id. § 301.6651-1(c)(1) (emphasis added). "Undue hardship" is "more than inconvenience to the taxpayer. It must appear that substantial financial loss . . . will result to the taxpayer for making payment on the due date . . . ." Id. § 1.6161(b).

[21] Id. § 301.6651-1(c)(2).

[22] Id.

16

### 3. **Failure to Deposit**

For failure-to-deposit situations under § 6656, the Treasury Regulations neither define nor explain "reasonable cause," but they do explain that the IRS will generally waive the requisite penalty if a taxpayer's failure to deposit was "inadvertent,"[23] requiring that determination of inadvertence must be "based on all the facts and circumstances."[24]

### 4. **Bright-Line Rule or Multi-Factor Test**

The first issue on appeal here is whether financial difficulty may ever be a "reasonable cause" for failure to file, pay, or deposit payroll taxes. The government urges us to join the Sixth Circuit and adopt a bright-line rule that financial difficulty may never constitute reasonable cause.[25] In the Sixth Circuit's Brewery case, a taxpayer brought a refund action to recover penalties assessed for its failure to pay and to deposit

---

[23] Id. § 301.6656-1(a)(1)(i).

[24] Id. § 301.6656-1(a)(2). It is unclear whether the "inadvertent" standard set forth for § 6656 penalties is identical to the "ordinary business care" standards set forth for §§ 6651(a)(1) and (2) penalties. We need not, however, decide this issue. Whether we determined the "inadvertent" standard was different from or identical to the "ordinary business care" standard, we would still conclude that S.I. lacked reasonable cause in satisfying its payroll tax obligations. Thus, for purposes of this opinion, we will assume that the standards are the same.

[25] Brewery, 33 F.3d at 592-93.

17

payroll taxes.[26]  The taxpayer insisted that it had exercised ordinary business care and prudence, but was still not able to satisfy its payroll tax obligations because of financial difficulties.[27]  The taxpayer argued that the tax penalties should be abated, as its failure to pay was for reasonable cause.[28]  On appeal, the Sixth Circuit concluded that, as payroll taxes are held by the employer in trust for the government and are for the exclusive use of the government, an employer's failure to pay and to deposit the taxes may never, as a matter of law, be excused because of the employer's financial difficulties.[29]  Otherwise, reasoned the Sixth Circuit, a taxpayer would be "permitted to self-execute a government loan" or "make the government 'an unwilling partner in a floundering business.'"[30]  The government requests that we adopt the Sixth Circuit's per se rule for the same reasons espoused in Brewery.

In opposition, S.I. urges us to adopt the facts-and-circumstances test ("multi-factor test") employed by the Second,

---

[26] Id. at 591.

[27] Id. at 591-92.

[28] Id.

[29] Id. at 593.

[30] Id. (citing C.J. Rogers, Inc. v. United States, No. 89-70209, 1990 WL 255586 (E.D. Mich. Sept. 17, 1990), and quoting Collins v. United States, 848 F.2d 740, 742 (6th Cir. 1988)).

18

Third, Seventh, and Ninth Circuits.  Each of these circuits has rejected <u>Brewery</u>'s holding, concluding that the <u>Brewery</u> approach would disregard the clear language and purpose of the applicable statutes and regulations, which require a fact-intensive analysis.

We acknowledge the existence of the circuit split on this issue, but need not — and therefore do not — resolve this issue today.  This is because, under either the bright-line rule or the multi-factor test, S.I.'s claim for abatement of penalties fails.  Thus, for purposes of this appeal, we assume without granting that the multi-factor test applies and proceed to analyze S.I.'s claim accordingly.

### 5.   S.I.'s Claim Under the Multi-Factor Test

A taxpayer has a heavy burden in establishing that it had reasonable cause not to file, pay, or deposit payroll taxes.[31] In fact, this burden is so weighty that, to our knowledge, only one appellate opinion has ever concluded that a taxpayer's failure to pay payroll taxes in a timely fashion was the result of reasonable cause and not willful neglect.[32]

Here, S.I. argues that Compaq's cutbacks, Enron's and Global

---

[31] <u>Boyle</u>, 469 U.S. at 245.

[32] <u>E. Wind</u>, 196 F.3d at 508-13.  In <u>East Wind</u>, the taxpayer had only failed to pay, not file or deposit, the payroll taxes in a timely fashion.  <u>Id.</u>

Crossing's collapses, S.I.'s loss of its financing arrangement with Prinvest, and the problems rampant throughout the financial sector of the national economy following the attacks of September 11, combined to frustrate S.I.'s ability to file, to pay, and to deposit its payroll taxes timely. We do not dispute that S.I. suffered financial difficulties. We do dispute, however, S.I.'s insistence that these difficulties and, more importantly, S.I.'s response to them, constituted reasonable cause for S.I.'s failure to satisfy timely its payroll tax obligations.

As for the penalties for failure to <u>file</u>, we cannot accept that S.I.'s financial difficulties prevented it from <u>filing</u> its payroll tax returns on time. Although S.I.'s financial difficulties may well have affected its ability to pay and to deposit, they certainly had no discernible effect on its ability to file. In fact, S.I. offers no legitimate reason for its failure to file, attempting instead to conflate the failure to file penalties with S.I.'s rationale for failing to pay and to deposit its payroll taxes in a timely manner. It is axiomatic, however, that these imposts penalize different failures and cannot be viewed through the same lens simply because a taxpayer fails to discharge all three duties fully and timely. S.I.'s case is not one in which a taxpayer's financial difficulties prevented it from filing its tax returns, regardless of any

20

inability to pay or to deposit —— if such a case even exists.  As S.I. has offered no legitimate reason for its failure to file payroll tax returns timely, it is not entitled to abatement of penalties for its failure to file.

As for penalties for failure to pay and failure to deposit, the jurisprudence reflects that the primary factors in determining whether a taxpayer exercised ordinary business care are (1) the taxpayer's favoring of other creditors over the government, which weighs against a finding of reasonable cause, and (2) the taxpayer's willingness to decrease expenses and personnel, which weighs in favor of a finding of reasonable cause.[33]

Despite all its financial troubles in late 2001 and early 2002, S.I. continued to pay virtually all its creditors, its

---

[33] E.g., Fran Corp., 164 F.3d at 820.  When S.I. initially faced its financial difficulties, it made the business decision to "grow" the company, rather than cut its expenses.  We are keenly aware that courts should not attempt to judge a company's business decisions with the illumination of hindsight.  Rather, courts should afford a company's business decisions a range of discretion.  Here, we will neither second-guess S.I.'s decision to "grow" nor nitpick the expenses that it classified as advertising, marketing, and client-relations efforts, by labeling them as extravagant or lavish.  We neither penalize S.I. for its unsuccessful attempt to "grow" its business nor credit its decisions to cut its expenses, which it did extensively only after its attempt to "grow" floundered.  Instead, our decision is based solely on S.I.'s conscious, knowing decision to satisfy essentially all of its obligations ahead of its payroll tax obligations.

employees, its contractors, its officer-stockholders, and its operating expenses in preference to its payroll tax obligations. S.I. relegated its obligations to the government to those owed to its other creditors and even those owed to its own officer-shareholders. The logical consequence of S.I.'s actions is the imposition of tax penalties. To conclude otherwise would be to sanction S.I.'s unilateral, self-execution of a government loan. We conclude that, like its non-entitlement to abatement of its penalties for failure to file, S.I. is not entitled to an abatement of its failure-to-pay or its failure-to-deposit penalties.[34]

### III.  CONCLUSION

Based on the applicable law and our extensive review of the parties' briefs and the record on appeal, we hold that S.I. failed to exercise ordinary business care and prudence in the timely discharge of its payroll tax obligations. S.I.'s failure to do so was not the result of a reasonable cause. Therefore, even when we assume _arguendo_ that the multi-factor test is the appropriate one, we conclude that S.I. is not entitled to an abatement of its payroll tax penalties. Accordingly, we affirm

---

[34] Having concluded that S.I.'s failure to satisfy its payroll tax obligations was without reasonable cause, we need not determine whether it resulted from willful neglect.

22

the summary judgment of the district court in favor of the government.

AFFIRMED.