See also 743 F.Supp. 834.

Susan A. MALLOY, Plaintiff–Counter–Claim Defendant,

John E. Malloy, Jr., Defendant–Counter–Claim Plaintiff–Appellant,

Moralmar Kitchen Cabinets, et al., Defendants–Counter–Claim Plaintiffs,

v.

UNITED STATES of America, Defendant–Counter–Claim Plaintiff–Appellee.

No. 92–4984.

United States Court of Appeals, Eleventh Circuit.

March 24, 1994.

Larry V. Bishins, Ft. Lauderdale, FL, Stephen R. Gladstone, Boca Raton, FL, for defendant-counter-claim plaintiff-appellant.

Michael L. Paup Tax Div. Appellate Section Dept. of Justice, William Estabrook, Kenneth W. Rosenberg, Washington, DC, for defendant-counter-claim plaintiff-appellee.

Before COX and DUBINA, Circuit Judges, and CLARK, Senior Circuit Judge.

CLARK, Senior Circuit Judge:

This is an appeal from the district court's order assessing a tax penalty against appellant John E. Malloy, Jr., pursuant to 26 U.S.C. § 6672. Following a non-jury trial, the district court concluded that Malloy was a responsible person who willfully failed to pay over withholding taxes for the employees of Sun Property Management International, Inc. ("SPMII"), for the last quarter of 1982 and the first two quarters of 1983. We affirm.

## BACKGROUND FACTS

In December 1982, Malloy decided to invest in a condominium management business that Steven Antuna had established some years earlier. Antuna had operated the business as Sun Property Management Corporation ("SPMC"). On December 8, 1982, Malloy invested $25,000 in the business and co-signed a note for $50,000 to provide additional working capital. At the same time, Malloy and Antuna restructured the business by forming a new corporation, Sun Company International, Inc. ("SCII"), in which they each acquired a 50 percent ownership interest. SCII purchased the assets and assumed certain liabilities of SPMC; the listed liabilities included approximately $80,000 in outstanding bank loans, but did not include any tax liabilities.[1] The condominium management business was transferred from SPMC to Sun Property Management International Inc. ("SPMII"), a wholly-owned subsidiary of SCII, and the business continued with the same offices, equipment and employees. By conducting the business through the new corporation, SPMII, Malloy intended to avoid responsibility for unknown liabilities of SPMC.

By February 1983, Malloy was well aware that the condominium management business was in serious financial trouble. At trial, one of SPMII's former employees testified that, in February 1983, she overheard a discussion between Malloy and the bookkeeper, Helen Mattheson, in which Malloy was "ranting and raving" about the company's inability to pay outstanding bills.[2] At about this same time, Malloy learned that the IRS had come by SPMII's offices inquiring about unpaid withholding taxes. During his testimony, Malloy explained that he believed that this inquiry involved the predecessor corporation, SPMC, rather than the new corporation, SPMII, in which he had an interest:

"And then I also found out that [Antuna] owed a lot of taxes from the previous company. When I bought into the company, I was afraid of an ongoing problem. So, what I did was formed a new corporation and the assets were transferred forward to the new corporation. And we'd only been going two or three months and the IRS came by concerning the old corporation looking for withholding there, and that's what brought my attention to what was happening."[3]

. . . . .

Q: And isn't it true that you stayed on in the company to protect your investment

---

1. 1st Supp. R1 Government's Exh. 10.

2. R7–169. By the time this case was tried, Helen Mattheson, the bookkeeper, was deceased.

3. R7–51 (quoting from Malloy's deposition).

after you originally learned about the tax liability?

A: Well, I had—I learned about the tax liability for the old company. It had nothing to do with the company I was involved in, other than it was what the old company had transformed into. As far as I knew, everything was being paid for the new company.... [4]

Malloy admitted that he never inquired as to whether SPMII, the new corporation, was paying withholding taxes; he simply relied upon Antuna's and Mattheson's assurances "that everything was fine, that everything was being paid." [5] According to Malloy, he never reviewed SPMII's books because, every time he asked to see the books, "there would be something else that Helen Mattheson would suggest needed attention or Mr. Antuna would have something for me to do." [6]

In February or early March 1983, Mattheson quit her job as bookkeeper for the business. Shortly thereafter, Malloy terminated another employee, citing as his reason the precarious financial condition of the company. Malloy continued to sign checks written on SPMII's bank account. The profitability of the business did not improve, and its assets were sold in June 1983. On July 6, 1983, Antuna and Malloy took their only paychecks from SPMII, each drawing $5,000.

According to Malloy, he learned for the first time on July 8, 1983, two days after his receipt of the $5,000 paycheck, that SPMII had failed to pay withholding taxes for the final quarter of 1982 and the first two quarters of 1983. Contradicting Malloy, Antuna testified that he and Malloy had discussed SPMII's tax liability months before the sale of the business's assets. The district court did not make a credibility determination as between these two witnesses. In concluding that Malloy was liable for the tax penalty, the district court relied not upon Malloy's actual knowledge of the nonpayment of taxes but, rather, upon his reckless disregard of the obvious risk of nonpayment. The district court found:

> Malloy contends he had no notice of any failure to remit taxes until July 8, 1983. Based on the testimony, the Court finds Malloy had notice of an obvious risk that the taxes were not being paid as early as February or March of 1983, when he learned that the IRS was investigating unremitted taxes. He contends he thought these taxes were related to the prior company, SPMC, which had been in financial trouble. But he knew that SPMII, SPMC's successor, was also in financial trouble. [7]

Based on this finding, the district court concluded that Malloy had "willfully" failed to pay the withholding taxes within the meaning of § 6672.

## DISCUSSION

The penalty provisions of 26 U.S.C. § 6672(a) make a responsible person who willfully fails to collect or pay over withholding taxes personally liable for such taxes. Specifically, the statute provides:

> Any person required to collect, truthfully account for, and pay over any tax imposed by this title who willfully fails to collect such tax, or truthfully account for and pay over such tax, or willfully attempts in any manner to evade or defeat any such tax or the payment thereof, shall, in addition to other penalties provided by law, be liable to a penalty equal to the total amount of the tax evaded, or not collected, or not accounted for and paid over....

Thus, § 6672 "imposes liability upon (1) a responsible person (2) who has willfully failed to perform a duty to collect, account for, or pay over federal employment taxes." [8] Once an individual is established as a "responsible person," the burden shifts to the individual to disprove willfulness. [9]

4. R7–54.

5. R7–38–39.

6. R7–36.

7. R5–180–15.

8. *Williams v. United States,* 931 F.2d 805, 809–10, *rehearing granted and opinion supplemented,* 939 F.2d 915 (11th Cir.1991).

9. *Id.* at 810.

In this case, Malloy does not dispute that he is a "responsible person." He challenges only the district court's finding of willfulness. According to Malloy, nothing short of actual knowledge will satisfy the willfulness requirement of § 6672; thus, he argues, he did not "willfully" fail to pay over the withholding taxes because he had no actual knowledge of the unpaid withholding tax liability until July of 1983. The legal issue we must answer, then, is whether a showing of actual knowledge of the tax liability is necessary to satisfy the willfulness requirement of § 6672.

In *Mazo v. United States*,[10] the former Fifth Circuit defined the willfulness requirement of § 6672 as follows:

The term "willfully" is defined by prior cases as meaning, in general, a voluntary, conscious, and intentional act, such as payment of other creditors in preference to the United States, although *bad motive or evil intent need not be shown*. The willfulness requirement is satisfied if the responsible person acts with *a reckless disregard of a known or obvious risk that trust funds may not be remitted to the Government,* such as by failing to investigate or to correct mismanagement after being notified that withholding taxes have not been duly remitted.[11]

Thus, the language of *Mazo* indicates that something less than actual knowledge, specifically, "a reckless disregard of a known or obvious risk," is sufficient to satisfy the willfulness requirement. More recent Eleventh Circuit cases have quoted *Mazo*'s "reckless disregard" standard with approval.[12] Accordingly, we hold that a responsible person is liable under § 6672 if he or she either had actual knowledge that the taxes were not being paid or acted with a reckless disregard of a known or obvious risk of nonpayment.

The record supports the district court's finding that Malloy had notice as early as February or March 1983 of an obvious risk that SPMII was not paying withholding taxes. At the time Malloy invested in the condominium management business, he was aware that the predecessor corporation, SPMC, had financial difficulties, and he saw that the business was restructured so he would not be responsible for SPMC's unknown liabilities. At least by February 1983, Malloy knew that SPMC had failed to pay withholding taxes and that SPMII, like SPMC before it, was having financial difficulties. Malloy also knew that the same employees who had been responsible for paying SPMC's bills were responsible for paying SPMII's bills. Malloy never made any inquiries to determine whether SPMII was paying the withholding taxes; he merely relied on Antuna's and Mattheson's assurances that "everything was fine." These facts support the district court's conclusion that Malloy acted with reckless disregard of the obvious risk that SPMII was not paying the withholding taxes.

At oral argument, Malloy's counsel argued that Malloy should not be held liable for taxes that were payable before he was on notice of SPMII's nonpayment. Malloy was on notice of the obvious risk of SPMII's nonpayment at least by February or March 1983, before the taxes for the first and second quarters of 1983 became payable. He may not have been on notice, however, at the time the taxes for the fourth quarter of 1982 became payable. Nevertheless, Malloy is liable for these taxes. In *Mazo*, the court held:

In the case of individuals who are responsible persons both before and after withholding tax liability accrues, as the appellants were in this case, there is a duty to use unencumbered funds acquired after the withholding obligation becomes payable to satisfy that obligation; failure to do so

---

**10.** 591 F.2d 1151 (5th Cir.), *cert. denied*, 444 U.S. 842, 100 S.Ct. 82, 62 L.Ed.2d 54 (1979).

**11.** *Id.* at 1154 (emphasis added and citations omitted).

**12.** *See Thibodeau v. United States*, 828 F.2d 1499, 1505 (11th Cir.1987); *George v. United States*, 819 F.2d 1008, 1011 (11th Cir.1987). *See also Wright v. United States*, 809 F.2d 425, 427 (7th Cir.1987) (the responsible person is liable "if he (1) clearly ought to have known that (2) there was a grave risk that withholding taxes were not being paid and if (3) he was in a position to find out for certain very easily").

when there is knowledge of the liability, as was the case here, constitutes willfulness.[13]

Malloy became a "responsible person" while SPMII's tax liability for the fourth quarter of 1982 was accruing. He was subsequently put on notice of the obvious risk that the taxes for that period had not been paid. He thereafter continued to sign checks to other creditors, rather than ensuring that the tax liability was satisfied. The district court did not err in holding Malloy liable for taxes owing for the fourth quarter of 1982, as well as those for the first two quarters of 1983.

### CONCLUSION

For reasons set out above, the decision of the district court is AFFIRMED.