Stephen K. VERRET, Plaintiff,

v.

UNITED STATES of America,
Defendant/Third Party
Plaintiff,

v.

Angela Massey, Third Party Defendant.

Civil Action No. 1:06–CV–636.

United States District Court,
E.D. Texas,
Beaumont Division.

Feb. 14, 2008.

Banker H. Phares, Attorney at Law, Beaumont, TX, for Plaintiff.

Jon E. Fisher, Department of Justice, Dallas, TX, for Defendant/Third Party Plaintiff.

Susan Jennifer Oliver, Attorney at Law, Beaumont, TX, Third Party Defendant.

## MEMORANDUM AND ORDER

MARCIA A. CRONE, District Judge.

Pending before the court is Defendant United States of America's ("the Government") Motion for Summary Judgment (# 23). Defendant seeks summary judgment on Plaintiff Stephen K. Verret's ("Verret") complaint against the Government for a refund of $408,918.66 assessed against him by the Internal Revenue Service ("IRS") for employment and withholding taxes, penalties, and interest. Having reviewed the pending motion, the submissions of the parties, the pleadings, and the applicable law, the court is of the opinion that summary judgment is warranted.

## I. *Background*

Community Healthcare Foundation was a 501(c)(3) tax-exempt organization, the primary business of which was the operation of Doctors Hospital located at 5500 39th Street in Groves, Texas.[1] By–Laws of the Board of Trustees of Doctors Hospital (the "By–Laws"), created by Community Healthcare Foundation, outlined the operational and managerial structure of Doctors Hospital. The By–Laws specified that the Board of Trustees (the "Board"), comprised of voluntary and unpaid members of the community, shall act as the governing body of Doctors Hospital. The By–Laws also provided for a Chairman of the Board and a Chief Administrative Executive Officer ("Executive Director" or "CEO") in addition to various other positions.

In May 1976, at the age of twenty-two, Verret joined Doctors Hospital's Board. He served in various capacities on the Board during his approximately twenty-six-year tenure, including holding the position of Chairman of the Board from 1999 until his departure in 2002. In addition to his service on the Board, Verret, unlike his fellow Trustees, had a unique relationship with Doctors Hospital. Stoneburner–Verret Electric Company, Inc. ("Stoneburner"), a company in which Verret is a majority stockholder, performed and invoiced Doctors Hospital on repeated occasions for "electrical services." Also, Verret's wife was employed by Doctors Hospital as the Chief Operating Officer from January through March 2001. In 1999, NewCare Hospital Corporation ("NewCare"), a business involved in the operation and management of hospitals, contracted with Verret to assist with the recruitment of specialized physicians to

---

1. Due to financial difficulties beginning as early as 1995, Doctors Hospital filed for bank- ruptcy protection in 2003.

staff a lucrative new practice area for the hospital. Verret devoted a significant amount of time to this endeavor, laboring "between 22 and 30 hours a week" during 2001 alone. For these services, which oftentimes overlapped with his duties as Chairman, Verret was compensated between $70,000.00 and $80,000.00 per year.

Despite its best efforts, Doctors Hospital's financial situation steadily deteriorated. During the first part of 2001, David Cottey ("Cottey"), Doctors Hospital's Executive Director, informed Verret and the Board that Doctors Hospital had failed to remit to the Government employment withholding taxes totaling approximately $400,000.00. The outstanding tax liability was ultimately satisfied with borrowed monies appropriated for the procurement of medical equipment. Cottey was informed by Verret, individually, and by the Board, collectively, however, that the payment of employment withholding taxes was of paramount importance and that, under no circumstances, should he fail to pay them again. Although the record does not indicate that the Board took any specific steps to devise, implement, or supervise a system of internal controls to ensure timely future payments, the Board repeatedly asked Cottey during 2001 about the status of Doctors Hospital's employment taxes. Each time, Cottey informed the Board that the employment taxes were current.

By the end of 2001, Doctors Hospital's financial condition was precarious. Contrary to his prior assurances, Cottey informed Verret and the Board in November 2001 that the income and FICA taxes for the employees were delinquent for the third and fourth quarters of 2001. Verret has not presented evidence that any measures were taken by the Board at that time to ensure the satisfaction of the outstanding liability other than again "urging" the Executive Director to pay the taxes. When Cottey failed to comply with the Board's request, a search was initiated to find a suitable replacement for Cottey. Nevertheless, the Board continued to employ and rely on Cottey during the interim.

■ The tax delinquency for the third and fourth quarters of 2001 ultimately gave rise to the instant action. The IRS found Verret, Cottey, and Angela Massey ("Massey"), who held positions as Doctors Hospital's Controller and Chief Financial Officer during the relevant period, to be "responsible parties" for the payment of federal withholding taxes under § 6672 of the Internal Revenue Code.[2] The IRS settled with Cottey and assessed a penalty of $407,097.66 plus $1,821.00 of interest against Verret.[3] Verret has paid this assessment in full and on October 12, 2006, initiated the above-styled action to obtain a refund. The Government filed the instant

**2.** The Government has asserted a Third Party Complaint against Massey, the Third Party Defendant. The Government takes the position that Massey was a "responsible party" for the payment of federal withholding taxes collected by Community Healthcare Foundation during the third quarter of 2001. Although demand has been made upon Massey for the payment of the penalties and interest associated with these taxes, Massey has failed to pay the full amount of the assessment. The Government contends that Massey is indebted to the Government for $182,205.59 plus interest; however, the Government is not seeking summary judgment against her at this juncture. Thus, the current motion addresses only Verret's complaint.

**3.** Statutory penalties under § 6672 for responsible persons willfully failing to ensure payment of federal withholding taxes are joint and several. *See Brown v. United States,* 591 F.2d 1136, 1142 (5th Cir.1979); 14 Mertens Law of Federal Income Taxation § 54:105 (Feb.2008). Responsible persons against whom a penalty under § 6672 has been assessed may seek contribution from other liable responsible persons. *See* 26 U.S.C. § 6672(d).

motion on October 15, 2007, seeking summary judgment on Verret's claim.

## II. *Analysis*

### A. *Summary Judgment Standard*

Rule 56(c) of the Federal Rules of Civil Procedure provides that summary judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." FED. R.CIV.P. 56(c). The party seeking summary judgment bears the initial burden of informing the court of the basis for its motion and identifying those portions of the pleadings, depositions, answers to interrogatories, admissions on file, and affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *Warfield v. Byron*, 436 F.3d 551, 557 (5th Cir.2006); *Lincoln Gen. Ins. Co. v. Reyna*, 401 F.3d 347, 349 (5th Cir. 2005); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *Martinez v. Schlumberger, Ltd.*, 338 F.3d 407, 411 (5th Cir.2003); *Terrebonne Parish Sch. Bd. v. Mobil Oil Corp.*, 310 F.3d 870, 877 (5th Cir.2002).

"A fact is *'material'* if it *'might affect* the outcome of the suit under governing law.'" *Bazan ex rel. Bazan v. Hidalgo County*, 246 F.3d 481, 489 (5th Cir.2001) (emphasis in original) (quoting *Anderson*, 477 U.S. at 248, 106 S.Ct. 2505); *accord Cooper Tire & Rubber Co. v. Farese*, 423 F.3d 446, 454 (5th Cir.2005); *Harken Exploration Co. v. Sphere Drake Ins. PLC*, 261 F.3d 466, 471 (5th Cir.2001); *Merritt–Campbell, Inc. v. RxP Prods., Inc.*, 164 F.3d 957, 961 (5th Cir.1999); *Burgos v. Southwestern Bell Tel. Co.*, 20 F.3d 633, 635 (5th Cir.1994). "Factual disputes that are irrelevant or unnecessary will not be counted." *Anderson*, 477 U.S. at 248, 106 S.Ct. 2505. "An issue is *'genuine'* if it is real and substantial, as opposed to merely formal, pretended, or a sham." *Bazan*, 246 F.3d at 489 (emphasis in original). Thus, a genuine issue of material fact exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248, 106 S.Ct. 2505; *accord EMCASCO Ins. Co. v. American Int'l Specialty Lines Ins. Co.*, 438 F.3d 519, 523 (5th Cir.2006); *Cooper Tire & Rubber Co.*, 423 F.3d at 454; *Harken Exploration Co.*, 261 F.3d at 471; *Merritt–Campbell, Inc.*, 164 F.3d at 961. The moving party, however, need not negate the elements of the nonmovant's case. *See Boudreaux v. Swift Transp. Co.*, 402 F.3d 536, 540 (5th Cir.2005); *Wallace v. Texas Tech Univ.*, 80 F.3d 1042, 1047 (5th Cir.1996) (citing *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir.1994)).

Once a proper motion has been made, the nonmoving party may not rest upon mere allegations or denials in the pleadings but must present affirmative evidence, setting forth specific facts, to show the existence of a genuine issue for trial. *Celotex Corp.*, 477 U.S. at 322 n. 3, 106 S.Ct. 2548 (quoting FED.R.CIV.P. 56(e)); *Anderson*, 477 U.S. at 256, 106 S.Ct. 2505; *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 n. 11, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986); *EMCASCO Ins. Co.*, 438 F.3d at 523; *Smith ex rel. Estate of Smith v. United States*, 391 F.3d 621, 625 (5th Cir.2004); *Malacara v. Garber*, 353 F.3d 393, 404 (5th Cir.2003); *Rushing v. Kansas City S. Ry. Co.*, 185 F.3d 496, 505 (5th Cir.1999), *cert. denied*, 528 U.S. 1160, 120 S.Ct. 1171, 145 L.Ed.2d 1080 (2000). "[T]he court must review the record 'taken as a whole.'" *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150, 120 S.Ct. 2097, 147

L.Ed.2d 105 (2000) (quoting *Matsushita Elec. Indus. Co.,* 475 U.S. at 587, 106 S.Ct. 1348); *see Riverwood Int'l Corp. v. Employers Ins. of Wausau,* 420 F.3d 378, 382 (5th Cir.2005). All the evidence must be construed "in the light most favorable to the non-moving party without weighing the evidence, assessing its probative value, or resolving any factual disputes." *Williams v. Time Warner Operation, Inc.,* 98 F.3d 179, 181 (5th Cir.1996); *see Reeves,* 530 U.S. at 150, 120 S.Ct. 2097; *Lincoln Gen. Ins. Co.,* 401 F.3d at 350; *Smith,* 391 F.3d at 624; *Malacara,* 353 F.3d at 398; *Brown v. City of Houston,* 337 F.3d 539, 541 (5th Cir.2003); *Harken Exploration Co.,* 261 F.3d at 471; *Daniels v. City of Arlington,* 246 F.3d 500, 502 (5th Cir.), *cert. denied,* 534 U.S. 951, 122 S.Ct. 347, 151 L.Ed.2d 262 (2001). The evidence of the nonmovant is to be believed, with all justifiable inferences drawn and all reasonable doubts resolved in his favor. *Palmer v. BRG of Ga., Inc.,* 498 U.S. 46, 49 n. 5, 111 S.Ct. 401, 112 L.Ed.2d 349 (1990) (citing *Anderson,* 477 U.S. at 255, 106 S.Ct. 2505); *Shields v. Twiss,* 389 F.3d 142, 150 (5th Cir.2004); *Martin v. Alamo Cmty. Coll. Dist.,* 353 F.3d 409, 412 (5th Cir.2003); *Martinez,* 338 F.3d at 411; *Gowesky v. Singing River Hosp. Sys.,* 321 F.3d 503, 507 (5th Cir.), *cert. denied,* 540 U.S. 815, 124 S.Ct. 66, 157 L.Ed.2d 30 (2003); *Chaplin v. NationsCredit Corp.,* 307 F.3d 368, 372 (5th Cir.2002). The evidence is construed "in favor of the nonmoving party, however, only when an actual controversy exists, that is, when both parties have submitted evidence of contradictory facts." *Olabisiomotosho v. City of Houston,* 185 F.3d 521, 525 (5th Cir.1999); *accord Boudreaux,* 402 F.3d at 540; *Little,* 37 F.3d at 1075.

Furthermore, " 'only *reasonable* inferences can be drawn from the evidence in favor of the nonmoving party.' " *Eastman Kodak Co. v. Image Technical Servs., Inc.,* 504 U.S. 451, 469 n. 14, 112 S.Ct. 2072, 119 L.Ed.2d 265 (1992) (emphasis in original) (quoting *H.L. Hayden Co. of N. Y., Inc. v. Siemens Med. Sys., Inc.,* 879 F.2d 1005, 1012 (2d Cir.1989)). "If the [nonmoving party's] theory is ... senseless, no reasonable jury could find in its favor, and summary judgment should be granted." *Id.* at 468–69, 112 S.Ct. 2072. The nonmovant's burden is not satisfied by " 'some metaphysical doubt as to the material facts,' by 'conclusory allegations,' by 'unsubstantiated assertions,' " by speculation, by the mere existence of some alleged factual dispute, or "by only a 'scintilla' of evidence." *Little,* 37 F.3d at 1075 (quoting *Lujan v. National Wildlife Fed'n,* 497 U.S. 871, 888, 110 S.Ct. 3177, 111 L.Ed.2d 695 (1990); *Matsushita Elec. Indus. Co.,* 475 U.S. at 586, 106 S.Ct. 1348; *Hopper v. Frank,* 16 F.3d 92, 97 (5th Cir.1994); *Davis v. Chevron U.S.A., Inc.,* 14 F.3d 1082, 1086 (5th Cir.1994)); *accord Warfield,* 436 F.3d at 557; *Boudreaux,* 402 F.3d at 540; *Wallace,* 80 F.3d at 1047. "Unsubstantiated assertions, improbable inferences, and unsupported speculation are not sufficient to defeat a motion for summary judgment." *Brown,* 337 F.3d at 541; *accord Hugh Symons Group, plc v. Motorola, Inc.,* 292 F.3d 466, 468 (5th Cir.), *cert. denied,* 537 U.S. 950, 123 S.Ct. 386, 154 L.Ed.2d 295 (2002); *see Hockman v. Westward Commc'ns, LLC,* 407 F.3d 317, 332 (5th Cir.2004); *Bridgmon v. Array Sys. Corp.,* 325 F.3d 572, 577 (5th Cir.2003).

Summary judgment is mandated if the nonmovant fails to make a showing sufficient to establish the existence of an element essential to his case on which he bears the burden of proof at trial. *Nebraska v. Wyoming,* 507 U.S. 584, 590, 113 S.Ct. 1689, 123 L.Ed.2d 317 (1993); *Celotex Corp.,* 477 U.S. at 322, 106 S.Ct. 2548; *EMCASCO Ins. Co.,* 438 F.3d at 523; *Cutrera v. Board of Supervisors of La. State Univ.,* 429 F.3d 108, 110 (5th Cir. 2005); *Patrick v. Ridge,* 394 F.3d 311, 315

(5th Cir.2004). "In such a situation, there can be 'no genuine issue as to any material fact,' since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." *Celotex Corp.*, 477 U.S. at 322–23, 106 S.Ct. 2548.

B. *Trust Fund Recovery Penalty*

The Internal Revenue Code ("IRC") requires employers to withhold federal income and social security taxes, Federal Insurance Contribution Act ("FICA") taxes, and Medicare taxes from the wages of employees. *See* 26 U.S.C. §§ 3102(a), 3402(a); *see also Slodov v. United States*, 436 U.S. 238, 242–43, 98 S.Ct. 1778, 56 L.Ed.2d 251 (1978); *Lencyk v. Internal Revenue Serv.*, 384 F.Supp.2d 1028, 1033 (W.D.Tex.2005); *Sutton v. United States*, 194 F.Supp.2d 559, 562 (E.D.Tex.2001) (citing *Barnett v. Internal Revenue Serv.*, 988 F.2d 1449, 1453 (5th Cir.), *cert. denied*, 510 U.S. 990, 114 S.Ct. 546, 126 L.Ed.2d 448 (1993)). These sums are commonly referred to as "trust funds" because the IRC provides that the monies are deemed to be "a special fund [held] in trust for the United States." 26 U.S.C. § 7501(a); *see also Staff IT Inc. v. United States*, Civ. A. No. H–H–04–2210, 2006 WL 314440, at *6 (S.D.Tex. Feb. 9, 2006), *aff'd*, 482 F.3d 792 (5th Cir.2007). Such funds, which are remitted to the government on a quarterly basis, are for the exclusive use of the United States and are not available to cover operational or business expenses. *See* 26 U.S.C. §§ 3102(b), 3403, 7501(a). Nevertheless, "the funds accumulated during the quarter can be a tempting source of ready cash to a failing corporation beleaguered by creditors." *Slodov*, 436 U.S. at 243, 98 S.Ct. 1778.

■ When net wages are paid to the employee, the taxes that were, or should have been, withheld are credited in full to the employee even if they are never remitted to the government. *Id.* at 243–45, 98 S.Ct. 1778. "Thus, unless the government can collect these taxes from the employer . . . the revenues are forever lost to the Government." *Lencyk*, 384 F.Supp.2d at 1033 (citing *Slodov*, 436 U.S. at 243–45, 98 S.Ct. 1778); *see also USLIFE Title Ins. Co. of Dallas v. Harbison*, 784 F.2d 1238, 1242–43 (5th Cir.1986); *Mazo v. United States*, 591 F.2d 1151, 1153 (5th Cir.), *cert. denied*, 444 U.S. 842, 100 S.Ct. 82, 62 L.Ed.2d 54 (1979). Section 6672 of the IRC provides the government with a mechanism, however, by which it may collect the taxes withheld and protect itself against such losses. *Lencyk*, 384 F.Supp.2d at 1033 (citing *Wetzel v. United States*, 802 F.Supp. 1451, 1455 (S.D.Miss. 1992)). That section imposes a penalty on any "person required to collect, truthfully account for, and pay over any tax" withheld who willfully fails to do so. 26 U.S.C. § 6672(a). The penalty is equal to the total amount of the tax not paid over and is itself referred to as a "tax" by the IRC. *Id.* at §§ 6671(a), 6672(a).

■ The term "person," as defined by the IRC, includes "an officer or employee of a corporation . . . who as such officer [or] employee . . . is under a duty" to collect, account for, or pay over the withheld tax. *Id.* at § 6671(b). This is known as the "responsible person." *Barnett*, 988 F.2d at 1453 & n. 6. An individual need not engage in all three of the activities listed in the statute in order to be held liable; involvement in any one of the three named activities is sufficient. *Slodov*, 436 U.S. at 250, 98 S.Ct. 1778. Thus, liability for a penalty is imposed only on (1) a responsible person (as defined in § 6671), who has (2) willfully failed to perform his or her duty to collect, account, or pay over the tax. *Barnett*, 988 F.2d at 1453; *Turnbull v. United States*, 929 F.2d 173, 178 (5th Cir.1991); *United States v. Star–Tel, Inc.*,

Civ. A. No. H–03–3904, 2005 WL 2810701, at *3 (S.D.Tex. Oct. 26, 2005); *Lencyk,* 384 F.Supp.2d at 1032.

### 1. *Responsible Person under § 6672*

■ The United States Court of Appeals for the Fifth Circuit generally takes a broad view regarding who can be a responsible person for purposes of liability under § 6672. *Dowdy v. United States,* No. 4:04–CV–232, 2005 WL 1719899, at *6 (E.D.Tex. July 22, 2005); *Lencyk,* 384 F.Supp.2d at 1034. Responsible persons may include "employees, stockholders, sureties, lenders and others outside the formal corporate organization." *Vollmer Elec. Co. v. United States,* Civ. A. No. SA–06–CA–360, 2007 WL 2048662, at *5 n. 46 (W.D.Tex. July 11, 2007). Responsibility " 'for collecting, accounting for, or paying over employee withholding taxes is a question of duty, status, and authority.' " *Renfro v. United States,* Civ. A. No. 3:04–CV–2574, 2006 WL 2035657, at *3 (N.D.Tex. July 19, 2006) (quoting *Gustin v. United States,* 876 F.2d 485, 491 (5th Cir.1989)); *see Wood v. United States,* 808 F.2d 411, 415 (5th Cir.1987) (citing *Howard v. United States,* 711 F.2d 729, 734 (5th Cir.1983)). "It is not necessary that an individual have the final or apocalyptic word as to which creditors should be paid in order to be subject to liability." *United States v. Bogard,* Civ. A. No. 4–88–492, 1991 WL 101535, at *4 (N.D.Tex. Apr. 19, 1991). In fact, one need not even have knowledge that he has such a duty or authority. *Barnett,* 988 F.2d at 1454. It is sufficient only that the individual has significant power, authority, and control over the disbursement of funds to find that he is a responsible person. *Bogard,* 1991 WL 101535, at *4 (citing *Neckles v. United States,* 579 F.2d 938, 940 (5th Cir.1978)). Thus, the crucial inquiry is whether the individual had the effective power to pay the taxes. *Barnett,* 988 F.2d at 1454; *Turnbull,* 929 F.2d at 178; *Howard,* 711 F.2d at 734.

■ In determining responsible person liability, the law disregards mechanical titles and functions of corporate officers and instead focuses on individuals who actually could have ensured the satisfaction of tax obligations. *Commonwealth Nat'l Bank of Dallas,* 665 F.2d at 752 (citing *Liddon v. United States,* 448 F.2d 509, 512–13 (5th Cir.), *cert. denied,* 406 U.S. 918, 92 S.Ct. 1769, 32 L.Ed.2d 117 (1971)). The Fifth Circuit, like other circuit courts, has developed certain indicia of responsibility that imply authority when a particular individual lacks the precise responsibility of withholding or paying employment taxes. *Barnett,* 988 F.2d at 1455. The court has noted that it:

> ... cannot ignore the extensive case law that narrowly constrains a fact finder's province in § 6672 cases. Thus, although "the facts ... are critical in ... any § 6672 case," we tend to agree with the other circuits that have held that certain facts will almost invariably prove dispositive of a finding of responsibility.

*Id.* at 1454 (alteration in original) (citation omitted). Factors considered by the Fifth Circuit to be indicative of responsible person status include whether a person:

> (i) is an officer or member of the board of directors; (ii) owns a substantial amount of stock in the company; (iii) manages the day-to-day operations of the business; (iv) has the authority to hire or fire employees; (v) makes decisions as to the disbursement of funds and payment of creditors; and (vi) possesses the authority to sign company checks.

*Logal v. United States,* 195 F.3d 229, 232 (5th Cir.1999) (quoting *Barnett,* 988 F.2d at 1455). No single factor is dispositive. *Barnett,* 988 F.2d at 1455. A person cannot "disqualify himself from responsible [person] status simply because he does not

fit into every category." *Raba v. United States,* 977 F.2d 941, 944 (5th Cir.1992).

■ In the Fifth Circuit, cases classifying an individual as a responsible person for purposes of liability under § 6672 are numerous. *See Barnett,* 988 F.2d at 1454 n. 10 (citing cases). In fact, "cases not finding § 6672 responsibility are relatively few and far between." *Id.* at 1456. "[T]he rationale for the broad net of § 6672 responsibility serves a valuable prophylactic purpose: it encourages officers, directors, and other high-level employees to stay abreast of the company's withholding and payment of employee's taxes." *Id.* at 1456–57. This "broad net" of liability can extend beyond the most responsible person; in reality, multiple persons can be deemed responsible for purposes of § 6672 liability. *Id.* at 1455; *see also Turnbull,* 929 F.2d at 178.

■ Verret contends that he was not a responsible person under the meaning of the statute for the third and fourth quarters of 2001. The record before the court, however, belies this assertion. Verret joined the Board in 1976 and served continuously through March 2002. During his approximately twenty-six-year tenure, Verret held various positions, including Chairman of the Board from 1999 until his departure in 2002. Although Verret argues that "the Board did not have the 'final word' as to what bills, including taxes, should or should not be paid," such authority is not necessary. *See Bogard,* 1991 WL 101535, at *4. Furthermore, a cursory review of the By–Laws reveals that the opposite is true. Article II, Section 1, states that the Board may

> ... delegate the management of the day-to-day operation of the Hospital to a management company or other person, provided that the business and affairs of the Corporation shall be managed and all corporate powers shall be exercised under the direction of the Board of

Trustees. The Board of Trustees shall have final responsibility for Hospital administrative activities and professional services, for the operation of the Hospital and for the quality of patient care at the Hospital.

Article IV, Section 1, refers to the Executive Director as merely "a duly authorized representative of the Board ... [who] shall report to the Chairman of the Board." Moreover, the Executive Director, if requested, "shall make reports to each meeting of the Board ... regarding budget matters, personnel matters, staff and Professional Staff matters, and all other relevant matters." The By–Laws are replete with statements indicating that the Board retains final authority, including the ability to "review the performance of the Executive Director not less than annually." Additionally, Verret admitted at deposition that the Board was atop the "pecking order" of Doctors Hospital. Thus, even assuming *arguendo* that the Board delegated financial duties to a management company or to Cottey, as Executive Director, it would not necessarily divest itself of all financial responsibility. Indeed, multiple parties can be, and quite often are, held responsible. *See Barnett,* 988 F.2d at 1455; *Turnbull,* 929 F.2d at 178.

Despite Verret's position as Chairman of the Board, he claims that "there is no evidence that anyone other than the CEO was responsible for the Hospital's day-to-day operations." The record, however, reveals a number of situations where Verret and the Board were involved in decisions impacting the operations of Doctors Hospital. For example, Verret's deposition testimony indicates that the Board, collectively, became concerned that John King ("King"), a physician performing a number of surgeries, would leave the hospital if certain equipment was not acquired. In order to procure this equipment and to ensure King's continued relationship with

the hospital, the Board secured a $500,000.00 loan. Although this loan was discussed by the Board following a review of a study performed by a certified public accountant, Verret concedes that he was one of only three individuals who actually negotiated the terms of this loan.

Q: Well, you say you and the doctors obtained the loan. Who negotiated with whoever you borrowed the money from to actually get the loan?

A: Dr. Morrell, myself, and a Dr. Keller.

Ultimately, the loan was "a joint and several loan," personally guaranteed by a number of individuals, including Verret.

Verret also involved himself in some of Doctors Hospital's tax activities.[4] He signed the company's IRS Form 990 for the 1999 and 2000 tax years as "Chairman."[5] Additionally, after learning of Cottey's initial failure to remit Doctors Hospital's withholding taxes in June or July 2001, the Board began requesting that Cottey provide proof that the payroll taxes were paid. Such "proof" primarily included oral assurances and the presentation of financial statements to the Board with separate line item disclosure of tax liability. Individually, Verret personally instructed Cottey to pay the taxes before he paid anyone else. Then, upon learning of Cottey's second failure to remit withholding taxes in November 2001, Verret

testified at deposition that he made additional inquiries.

Q: Did you talk to anybody at Doctor's other than Mr. Cottey about the payroll taxes?

A: At what time period?

Q: After you first learned of the unpaid taxes?

A: I talked to a gentleman by the name of Harry Baker, which [sic] was the CEO of Tri–Health Services, which was the new management company.

Q: You spoke to him about the taxes?

A: Of their plan to get the taxes paid.

. . .

Q: Okay. When did you talk to him?

. . .

A: First or second week of December of '01.

Verret's taking the initiative to contact and discuss a plan to pay delinquent withholding taxes with the new management company confirms his involvement in Doctors Hospital's financial affairs—particularly its tax affairs—during the relevant period.

The record also reveals that Verret, unlike other board members, spent a significant amount of time at Doctors Hospital. In 1999, the management company asked Verret to assist in recruiting physicians in the "industrial occupation business." In-

---

4. While the court appreciates that the board members volunteered their time and effort to Doctors Hospital and to the furtherance of medicine in this area, it has been recognized that:

 There is a sufficient social value in having individuals agree to serve on the boards of hospitals, schools, houses of worship, and the like that society ought to be willing to permit such service to be unhindered by the risk of massive personal tax liability. Of course, unpaid service on the board of a not-for-profit institution should not confer automatic immunity from the strictures of

section 6672. If a board does take an active role in an institution's financial affairs—particularly its tax affairs—... the board members may well be deemed responsible persons.

*Simpson v. United States*, 664 F.Supp. 43, 49 (E.D.N.Y.1987).

5. The company's 2001 IRS Form 990 was signed on June 30, 2003, by John Murphy, III, Chief Financial Officer at that time, and was received by the IRS on July 1, 2003. Verret left the Board in 2002.

dustrial occupation, according to Verret, provided a "new stream of revenue that healthcare facilities were looking at bringing on board. It took care of drug screens, workmen comp injuries, and normally a hospital would contract directly with an employer to provide services at some rate." Verret's new role, for which he was compensated between $70,000.00 and $80,000.00 per year as a consultant, demanded "[b]etween 22 and 30 hours a week" during 2001 alone. This required Verret to spend a significant amount of time at Doctors Hospital, frequently eating breakfast and lunch at the hospital. Such activities overlapped with his duties as Chairman and were oftentimes indistinguishable. Massey, who understood Verret's role solely to be Chairman of the Board, stated that she saw Verret at the hospital often and that he would stop by "almost every day" and "talk with David Cottey." Verret's involvement in the development of new cash flow strategies, frequent presence, and nearly daily discussions with the Executive Director further demonstrate his participation in the operations of Doctors Hospital.

Moreover, Verret presents no evidence disputing the Board's ability to hire and fire employees. Verret's own deposition testimony states that the Board, for which Verret served as Chairman, voted to allow Cottey to continue as Executive Director in 2001 even after Doctors Hospital's management company, NewCare, filed for bankruptcy. Verret indicates that the Board discussed terminating Cottey's employment after it learned of his first failure to remit withholding taxes.[6] Additionally, Massey indicated that Verret and the Board could "get rid of [her] in a heartbeat, and ... could get rid of David [Cottey] ... if the need arose." Thus, this factor also weighs against Verret.

Finally, Verret's authority to sign company checks is also indicative of his status as a responsible person under the statute. Verret argues, however, that Doctors Hospital's checkbooks were located in a locked closet in the accounting department and that the record is devoid of any instances where Verret signed a check on the company's behalf. He maintains that check-writing authority rested with Cottey and his staff. Nevertheless, signature cards for each of Doctors Hospital's three bank accounts have been provided by the Government. Interestingly, although each account has four signatories, Verret is the only individual to be listed as a signatory on all three accounts. In fact, Verret's signature appears first on each signature card. There is no evidence that Verret ever requested and was denied access to the checkbooks in order to satisfy outstanding liabilities, including employment taxes. Massey, who had unrestricted access to the checkbooks, admitted that if a disagreement arose between Cottey and Verret, Verret would prevail as Chairman of the Board. While not conclusive, this factor weighs against Verret.

In addition to deposition testimony, Verret presents the affidavit of Doctors Hospital's Controller during the relevant tax periods, Dena Whitmire ("Whitmire"), the affidavit of Dr. Rocco Morrell ("Dr.Morrell"), a fellow member of the Board, and the affidavit of Frank Butts ("Butts"), a certified public accountant ("C.P.A.") who

---

**6.** When asked at deposition why Cottey's employment was not terminated after the Board learned of his initial failure to pay employment withholding taxes, Verret responded as follows:

It's a good question in hindsight. The facility had difficulty because of its financial position in recruiting new CEOs to come. It was discussed by the board, but none of the board wanted to run a hospital, and his credentials that he had submitted appeared that he had run several other companies, that he was going to get over this hump.

performed a six-month financial review of the hospital's records. In each affidavit, the affiant attributes financial responsibility to either Cottey or Massey. Dr. Morrell adds that the By–Laws do not confer any authority to make business and/or financial decisions concerning the operation of Doctors Hospital upon Verret. Further, Whitmire states that she "did not observe Mr. Verret exercising any power, authority or control over the payment of accounts of Doctors Hospital, including the payment of employment taxes." This evidence does not establish that Verret lacked responsibility as defined by the IRC, nor does it create an issue of material fact regarding his status. Indeed, it is undisputed that Verret did not actually pay the taxes at issue when due—that is what gave rise to the assessment at the outset. Assuming *arguendo* that Cottey and Massey possessed primary responsibility for the payment of taxes, that fact alone does not relieve Verret of liability. *See Barnett,* 988 F.2d at 1455; *Turnbull,* 929 F.2d at 178. Additionally, the By–Laws refute Dr. Morrell's assertions. Moreover, Verret need not exercise his vested authority; it is sufficient to infer liability if he merely possessed the effective power to pay the taxes. *See Barnett,* 988 F.2d at 1454; *Turnbull,* 929 F.2d at 178; *Howard,* 711 F.2d at 734. At the very least, two of the affidavits are suspect and arguably self-motivated—those of the Controller and a member of the Board, who are not necessarily immune from § 6672(a) liability themselves. With regard to Butts's affidavit, he merely performed a review, which was very limited in scope, for use by a secured creditor. In sum, these affidavits are not conclusive and are not particularly illuminating.

▆▆▆ The evidence, viewed as a whole, weighs in favor of responsible party status. *See Logal,* 195 F.3d at 232. "Once the Government offers an assessment into evidence, the burden of proof is on the tax-payer to disprove his responsible-person status or willfulness." *Barnett,* 988 F.2d at 1453. Thus, Verret bears the burden of adducing evidence that creates a genuine issue of material fact as to his responsible person status or willfulness. *See, e.g., Sutton,* 194 F.Supp.2d at 563. Here, the uncontested facts reveal that Verret (1) served approximately twenty-six years in various capacities on Doctors Hospital's Board, (2) held the position of Chairman of the Board during the relevant periods, (3) negotiated and personally guaranteed a $500,000.00 working capital loan for the hospital, (5) took steps to ensure payment of delinquent withholding taxes on a prior occasion after learning that the Executive Director had failed to do so, (6) actively participated in recruiting physicians and developing a new source of revenue for Doctors Hospital, (7) conversed with the Executive Director on almost a daily basis, (8) signed the company's IRS Form 990 for 1999 and 2000, (9) possessed, along with the Board, the authority to hire and fire high level employees, and (10) was a signatory on all of Doctors Hospital's checking accounts. Verret, in the court's opinion, clearly qualifies as a "responsible person."

2. *Willfully Failing to Collect, Account for, or Pay Over Trust Fund Monies*

▆▆▆ Liability is imposed upon a responsible person only if he or she "willfully" fails to collect, account for, or pay over withheld taxes. 26 U.S.C. § 6672; *see also Mazo,* 591 F.2d at 1155. Once a court has determined that an individual is a "responsible person" under § 6672, the person must prove that he did not act willfully in order to avoid liability under that section. *See Morgan v. United States,* 937 F.2d 281, 286 (5th Cir.1991) ("The responsible person bears the burden of proving [the] actions [taken] were not willful.") (ci-

tations omitted). Willfulness under the statute "'requires a voluntary, conscious, and intentional act, but not a bad motive or evil intent.'" *Renfro,* 2006 WL 2035657, at *3 (quoting *Barnett,* 988 F.2d at 1457); *see also Morgan,* 937 F.2d at 285 (citing *Gustin,* 876 F.2d at 492; *Wood,* 808 F.2d at 415). Willfulness is normally established by evidence that the responsible person paid other creditors with knowledge that withholding taxes owed to the United States were in arrears at the time. *Gustin,* 876 F.2d at 492; *Wood,* 808 F.2d at 415; *Howard,* 711 F.2d at 736 (Willfulness requires a showing of a "considered decision not to fulfill one's obligation to pay taxes owed, evidenced by payments made to other creditors in knowledge that taxes are due."). "[I]n the case of individuals who are responsible persons 'both before and after withholding tax liability accrues,' there is 'a duty to use unencumbered funds acquired after the withholding obligation becomes payable to satisfy that obligation'; failure to do so when there is knowledge of the liability constitutes willfulness." *Renfro,* 2006 WL 2035657, at *3 (quoting *Barnett,* 988 F.2d at 1458).

 Courts have also concluded that a responsible person acted "willfully" if he recklessly disregarded a known or obvious risk that trust funds would not be paid over to the United States. *Gustin,* 876 F.2d at 492; *Wood,* 808 F.2d at 415; *see also Malloy v. United States,* 17 F.3d 329, 332 (11th Cir.1994) (concurring with the Fifth Circuit's interpretation that something less than actual knowledge, specifically, "a reckless disregard of a known or obvious risk," is sufficient to satisfy the willfulness requirement); *Mazo,* 591 F.2d at 1154. Willfulness based upon reckless disregard does not require a high degree of recklessness. Indeed, "the purpose of the statute would be thwarted, just by compartmentalizing responsibilities within a business (however small) and adopting a 'hear no evil-see no evil' policy." *Wright v.*

*United States,* 809 F.2d 425, 427 (7th Cir. 1987). Conduct amounting to mere negligence is insufficient to satisfy the willfulness standard under the statute. *Morgan,* 937 F.2d at 286 (citing *Gustin* 876 F.2d at 492). Responsible persons, however, act with reckless disregard and are thus "willful" under § 6672 where their conduct is grossly negligent. *Wright,* 809 F.2d at 427; *accord United States v. McCombs,* 30 F.3d 310, 320 (2d Cir.1994); *United States v. Running,* 7 F.3d 1293, 1299 (7th Cir. 1993) ("Reckless disregard in this context is tantamount to gross negligence."); *Thomsen v. United States,* 887 F.2d 12, 18 (1st Cir.1989). Gross negligence that leads to a finding of reckless disregard, willfulness, and thus liability for the unpaid trust fund taxes occurs when a responsible person: "(1) clearly ought to have known that (2) there was a grave risk the withholding taxes were not being paid and (3) he was in a position to find out for certain very easily." *DeGraff v. United States,* 488 F.Supp.2d 696, 701 (N.D.Ill. 2007) (quoting *Wright,* 809 F.2d at 427); *see also Phillips v. United States Internal Revenue Serv.,* 73 F.3d 939, 944 n. 1 (9th Cir.1996) (following the Seventh Circuit's interpretation of willfulness as encompassing reckless disregard); *Malloy,* 17 F.3d at 332 n. 12; *Thomsen,* 887 F.2d at 18; *In re Baker,* Nos. 488–40565–MT–7, 1993 WL 183721, at *5 (Bankr.N.D.Tex.1993). If a responsible officer knows the corporation has recently incurred a payroll tax delinquency and is aware of the deteriorating affairs of the corporation, he runs the risk of being held personally liable for the unpaid withheld payroll taxes if he fails to take steps to ascertain the state of the payroll tax liabilities or to institute effective financial controls to guard against nonpayment. *Wright,* 809 F.2d at 428.

 In this case, Verret claims that he did not become aware of Doctors Hospi-

tal's delinquency for the relevant period until November 2001.[7] At or around the time Verret purportedly learned of the outstanding liability, Doctors Hospital made six federal tax deposits.[8] Plaintiff argues that following this series of payments and the retention of a new management company, he could reasonably "infer" that Doctors Hospital was current on its payroll taxes. Interestingly, Verret did not advert to these six deposits—or any deposits for that matter—until the Government supplemented the record with this information on February 4, 2008, pursuant to court order, suggesting that he was unaware of them prior to that date. Further, Verret's averments contradict the evidentiary record in a number of instances. First, despite his not being notified by the IRS about the outstanding tax liability until the fourth quarter of 2002[9], at deposition he testified that he voluntarily left Doctors Hospital in early 2002 because he "decided that the facility had this tax liability that [he] had been made aware of in November [2001] and that it was not being taken care of." Second, in Verret's Response to the Government's Motion for Summary Judgment, he discloses that after Cottey failed to make the necessary payments, as advised in November 2001, the Board, including Verret, "began its search for a replacement for the Executive Director." Third, Verret's deposition testimony reveals that he spoke with Harry Baker, CEO of the new management company, about a "plan to get the taxes paid"

during the "[f]irst or second week of December '01." Thus, the record evidence refutes the notion that Verret inferred that the hospital was current on its tax obligations in November 2001. Simply asking the court to surmise that Verret "acted reasonably and easily could have believed that after these six (6) payments that the Hospital was current on its payroll taxes" is insufficient to meet his burden as a responsible person to adduce evidence disproving that he acted willfully, especially in view of the overwhelming evidence to the contrary. See Barnett, 988 F.2d at 1453; Sutton, 194 F.Supp.2d at 563. At a minimum, Verret failed to take reasonable steps to ascertain whether the taxes had in fact been paid and to resolve any uncertainty regarding the issue. To excuse him from liability when he did not investigate further in order to determine the true status of Doctors Hospital's tax obligations is unreasonable:

> [This] argument amounts to the position that even with knowledge of a corporation's financial straits a responsible officer may immunize himself from the consequences of his actions by wearing blinders which will shut out all knowledge of the liability for and the nonpayment of its withholding taxes. But such a deliberate or reckless disregard of the facts and known risks cannot blunt the impact of the penalty statute on those responsible for such nonpayment. . . .

---

7. Verret points out that his knowledge of past (but eliminated) tax deficiencies does not automatically create an affirmative duty to investigate and absolutely prevent all future delinquencies. See id. at 429 (citing Godfrey v. United States, 748 F.2d 1568, 1579 (Fed.Cir. 1984)). ("[M]ere knowledge of a past deficiency does not impose strict liability on a responsible officer for delinquencies during his tenure.").

8. IRS transcripts, provided by the Government, indicate deposit transactions on No-

vember 2, 5, 6, 7, 8, and 9, 2001, totaling $198,549.10.

9. At deposition, Verret responded as follows:

Q: When did you first hear from the IRS about these unpaid taxes?
A: Last quarter of 2002.
. . .
Q: So after you had left?
A: Correct.

*Calderone v. United States,* 799 F.2d 254, 260 (6th Cir.1986) (citation omitted).

The record reflects that Verret was Chairman of the Board throughout 2001, during which time Doctors Hospital failed to remit employment withholding taxes to the Government on two separate occasions. He was aware of the failure during the first part of 2001 and made some effort to remedy the situation. He also knew that it was primarily Cottey's responsibility as Executive Director to remit timely the required tax payments to the IRS and that he had failed to do so, resulting in two tax delinquencies—one during the first part of 2001 and the second during the third and fourth quarters of 2001. Yet, as a member of the Board, charged by the By–Laws to "assure competence and procedure on the part of physicians, nurses or others appointed to work in the Hospital," Verret continued to employ and rely on Cottey, even after learning of his failure to comply with federal law, his misappropriation of corporate funds, and his untruthful assurances. The Board, with Verret at its helm, simply tolerated Cottey because "none of the board wanted to run a hospital." Moreover, Verret and the Board allowed the position of Controller and Chief Financial Officer of the hospital to be filled by an individual lacking a college degree or any accounting background other than the completion of one basic, introductory course, much less a C.P.A. license or other professional certification.

While there is no evidence to suggest that Verret ever actually signed a check on behalf of Doctors Hospital, he was certainly aware of its declining financial situation. Verret, more than other members of the Board, arguably possessed greater insight into the seriousness of the hospital's financial problems. At deposition, Massey explained:

> We would sit daily with a piece of paper that we had a detailed spreadsheet that would tell us who we owed money to, how much we owed, how old it was. And you know, we would go—we, Mr. Cottey, myself, Dena Whitmire, she was the controller. She provided the schedule. We would go through—she would have the list of vendors who would call, threaten us, what have you, and then we would talk about it. But there generally—I know—I would say three times a week or so—a lot of times Mr. Verret would come in, and Dr. Morrell would come in while we were doing those meetings.

It should have been clear to any responsible person in Verret's position that Doctors Hospital was in financial trouble. He "must have known how tempting it is for a floundering company to use the money that it has withheld from its employees' paychecks for purposes seemingly more urgent that paying taxes currently." *Wright,* 809 F.2d at 427; *see also Slodov,* 436 U.S. at 243, 98 S.Ct. 1778. At the very least, Verret should have been cognizant of a grave risk that the payroll withholding taxes would not be remitted to the IRS after being informed of the second delinquency in November 2001. *See DeGraff,* 488 F.Supp.2d at 701.

Despite this patent risk, Verret, who had the actual authority to inquire and to correct any tax problems, admittedly did nothing of substance. *See DeGraff,* 488 F.Supp.2d at 701.

> Q: Okay. Did you give him [Cottey] after November 1st, 2001, any instructions on what to pay?
>
> A: No, sir, I did not.
>
> Q: Did you take any additional steps after November 1st, 2001, to make sure that the taxes were getting paid?
>
> A: No, sir, I did not.

Although the court acknowledges that Verret did not possess great financial exper-

tise, he did not even undertake the simple tasks of requesting cancelled checks documenting the tax payments or contacting the IRS to verify such payments. *See In re Rutherford,* 178 B.R. 716, 721 (Bankr. S.D.Ohio 1995).

Q: Did you ask to see documents such as the actual payments to the IRS of—I think Ms. Massey testified it was every two weeks?

A: No, sir, I did not.

Q: Did you ask to look at the actual payroll tax returns, Form 941s?

A: No, sir, I did not.

In fact, there is no indication that Verret questioned the status of Doctors Hospital's tax liability when he accepted significant compensation in 2002 after being notified of the tax delinquency in November 2001.[10] Only a slight inquiry would have revealed that Doctors Hospital's employment taxes were not being paid in full. While the record indicates that Verret "talked" to the management company about its plan to pay the taxes after learning of the earlier delinquency and that he received some periodic financial reports, there is no evidence regarding the implementation of any significant financial controls or the initiation of remedial action to ensure that the payments were actually made or that funds were preserved to satisfy withholding taxes. Aside from the Board's hiring a new management company and again delegating the primary tax responsibility, Verret took no action to assure the payment of taxes. Interestingly, when asked about the payroll taxes for his own company, Stoneburner, Verret indicated that the "taxes are paid because it's reviewed by a certified public accountant on a weekly basis." Yet Verret and the Board, aware that Doctors Hospital's financial position continued to deteriorate to the point of being classified as "very tight," seemed to be content with the oral assurances of someone Verret himself described as "no longer reliable." Apparently, Verret possessed the acumen and expertise to implement sufficient controls over his own affairs, but he neglected to exercise such care with respect to the hospital.

It seems inconceivable that Verret, a twenty-six-year veteran of the Board, who spent significant amounts of time visiting the hospital and conversing with Cottey on a daily basis, was unaware of Cottey's failure to pay the hospital's employment taxes to the IRS. If Verret did not know of Cottey's failure to pay the trust fund tax liability to the IRS during the third and fourth quarters of 2001, it is because he chose not to know. Verret could have exercised substantial control over the decision-making process in order to ensure that Doctors Hospital paid its taxes. Rather, instead of verifying that the hospital's tax obligations were being met, he turned a blind eye to the situation and chose not to exert any authority over Cottey or the business affairs of Doctors Hospital. At a minimum, such actions constitute gross negligence or reckless disregard and, thus, a willful failure to collect, account for, or pay over taxes owed by Doctors Hospital. *See Wright,* 809 F.2d at 427. "The statute is harsh, but the danger against which it is directed—that of failing to pay over money withheld from employees until it is too late, because the company has gone broke—is an acute one against which, perhaps, only harsh measures are availing." *Id.* at 428.

3. *Voluntary Board Member Protection*

■ Finally, Verret argues that he is exempt from any penalty provided for in

---

**10.** Community Health Care Foundation's 2002 Form 990 indicates that Verret received $26,000.00 in compensation as "PRESI-DENT/CHAIRMAN FULL–TIME THRU 6/30/02."

§ 6672(a) because he meets the requirements enumerated in § 6672(e) of the IRC. This section provides an exception to the Trust Fund Penalty for voluntary board members of tax-exempt organizations. Section 6672(e) states, in pertinent part:

> No penalty shall be imposed by subsection (a) on any unpaid, volunteer member of any board of trustees or directors of an organization exempt from tax under subtitle A if such member—
>
> (1) is solely serving in an honorary capacity,
>
> (2) does not participate in the day-to-day or financial operations of the organization, and
>
> (3) does not have actual knowledge of the failure on which such penalty is imposed.

26 U.S.C. § 6672(e) (2001).

Here, Verret does not fall within the ambit of the § 6672(e) exception because he was not serving solely in an honorary capacity as the Chairman of the Board of Doctors Hospital. During his twenty-six-year tenure as a Board member, Verret attended Board meetings, negotiated and personally guaranteed a $500,000.00 working capital loan to acquire new equipment, reviewed financial information, actively engaged in recruiting physicians and developing a new source of revenue for Doctors Hospital, conversed with the Executive Director on an almost daily basis, signed the hospital's IRS Form 990 for 1999 and 2000, and was a signatory on all of Doctors Hospital's checking accounts. He also actively participated in the selection and retention of outside companies to assist in the management of Doctors Hospital. Thus, Verret clearly played an active role in the management of Doctors Hospital and was not serving solely in an honorary capacity. Accordingly, Verret is not shielded from liability by § 6672(e) under the facts of this case. *See Jefferson v.*

*United States,* 459 F.Supp.2d 685, 690 (N.D.Ill.2006) (finding that the responsible party was not entitled to immunity under similar circumstances).

### III. *Conclusion*

For the reasons set forth above, there is no genuine issue of material fact as to whether Verret was a "responsible person" who acted "willfully." He is personally liable under 26 U.S.C. § 6672(a) for the unpaid withholding taxes of Doctors Hospital. Accordingly, the Government's Motion for Summary Judgment is GRANTED. Verret's action for recovery of the sum of $408,918.66 and all statutory additions provided by law is dismissed with prejudice.